UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 16-50102 |
| Plaintiff, | UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL |
| vs. | |
| ANDRIES SNYMAN, | |
| Defendant. | |

The United States of America, by and through Assistant United States Attorney Eric Kelderman, submits this memorandum in opposition to the defendant's motion for new trial, Docket 114. For the reasons submitted below, the Court should deny the defendant's motion in all respects.

## PROCEDURAL HISTORY

On August 6, 2016, the defendant was charged by Complaint with Attempted Enticement of a Minor Using the Internet, in violation of 18 U.S.C. § 2422(b). Docket 1. On August 16, 2016, a grand jury returned an Indictment charging the defendant with the same offense. Docket 16. This matter was tried to a jury on December 5-8, 2017. On December 8, 2017, a jury convicted the defendant of the sole count charged in the Indictment. Docket 96.

The defendant later filed a motion for judgment of acquittal, Docket 101, 102. The Court denied the motion on January 17, 2018. Docket 105.

## JURY TRIAL[1]

In ruling on the defendant's prior motion for judgment of acquittal, the

Court summarized the evidence presented at the trial as follows:

> The exhibits admitted into evidence at trial constitute a significant portion of the evidence relevant to defendant's pending motion. The jury heard testimony from various witnesses including Brian Freeouf, Brent Gromer, John Barnes, Irene Summers Temple and Ilan Meyer.
> Freeouf testified at trial he created an account on Grindr—an application some gay men use to connect with each other, often for sex—as part of a law enforcement sting operation. Defendant and Freeouf began communicating on Grindr, Freeouf claimed he was a 14 year-old boy and sent defendant a photo of a 14 year-old male associated with law enforcement. They continued sending messages to each other on Grindr, and then they exchanged phone numbers and began texting. Some of the Grindr messages and text messages related to sexual activity. (Exhibits 1 & 2); see Docket 102 at pp. 6-11. Defendant set up a time and place to meet the person with whom he believed he was communicating, he showed up as planned and law enforcement arrested him. Law enforcement proceeded to interrogate defendant, and he denied any intent to engage in sexual activity.

Docket 105 at 5.

At trial, the Court instructed the jury on the essential elements of the crime

charged, as follows:

> One, on or about August 5, 2016, in the District of South Dakota, Mr. Snyman used a cell phone or computer attached to the internet to attempt to knowingly persuade, induce, entice or coerce an individual under the age of 18 to engage in sexual activity;
> Two, Mr. Snyman believed the individual was less than 18 years of age; and

---

[1] The United States has summarized the trial evidence in the light most favorable to the verdict as outlined in the Court's ruling on the motion for judgment of acquittal, supplemented with additional information necessary to respond to the defense motion for new trial.

Three, if the sexual activity had occurred, Mr. Snyman could have been charged with a criminal offense under South Dakota law.

Docket 89 at 6-7.

During the trial, the United States offered as an exhibit a recording of the defendant's interview with Special Agents Gromer and Freeouf. See Exh. 3; T.T. at 98. During that interview, the defendant stated he could "prove to you I have another guy I'm meeting tonight um so I'm not interested in, I'm forty-one I don't do this six, seven times a night. Um and this other guy I've been talking since last year so." See Exh. 3. Later, the defendant stated, "Yes, I was meet, was gonna meet this friend earlier and now he's late so you know we were gonna meet later and you can check that phone there's a message as well." See Exh. 3.

During closing arguments, the prosecutor commented that the defendant had "lied during his interview [and] said he had another date that night." T.T. 326. The prosecutor noted, "[h]e is 41 years old and he goes twice in one night, right? He didn't. The evidence shows he may have made a whole bunch of phone calls and made a whole bunch of unreturned text messages. There is zero evidence he had anybody else to meet." T.T. 326.

In denying the motion for judgment of acquittal, the Court ruled:

> Based on trial testimony, Exhibits 1 and 2, the Grindr messages and text messages, the evidence established defendant believed he was communicating with a 14 year-old boy while using a cell phone connected to the internet. The exhibits contain communications defendant sent to Freeouf's undercover persona about engaging in sexual activity with him, including messages referring to acts of sexual penetration. Defendant arranged a time

3

to meet the person with whom he believed he was messaging, and defendant showed up.  Based on that record, the court finds a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Boesen, 491 F.3d at 856 (internal quotation marks omitted); see Docket 89 at pp. 6-7 (listing the essential elements).  Put another way, the court finds the record fails to establish that "there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt."  Id. at 855 (internal quotation marks omitted).  The court comes to this conclusion after "drawing all reasonable inferences in favor of the verdict[.]"  Id. at 856 (internal quotation marks omitted).

Docket 105 at 7-8.

## NEW EVIDENCE

During trial, it became apparent the defendant would rely on his prior statements during his interview that he had set up another sexual liaison for later that night, which somehow showed he was not intending to have sex with the 14 year-old.  The United States turned over the text message and call log portions from the defendant's cell phone extraction, then believing those were the only relevant portions of the phone extraction.  The late disclosure of this evidence was brought out by the defendant before the jury. T.T. 120.  The United States did not turn over the iPhone iMessage portion of the phone extraction, not realizing at the time, some of the communications with this other individual, "rapid city jonny hello grdr" (hereafter "Jonny"), were sent via iPhone iMessage. Docket 116, 118, Attachment B at 24-28; Extraction Report.  In that Extraction Report, it is now clear that the communications between the defendant and Jonny switched back and forth between "instant messages" and "SMS

4

messages." Id. This occurred unbeknownst to the United States at the time of the disclosure of the SMS and call log portions of the phone extraction.

After the verdict, the United States provided the full Cellebrite extraction of information contained on the defendant's cell phone to the defense at its request. During a defense expert's review of the extraction, the defense located the previously undiscovered folder containing the iPhone iMessage portion of the communications between the defendant and Jonny. As relevant here, the folder contained a number of return iPhone iMessages from Jonny not previously known to the United States because they were not contained in the SMS message portion of the extraction.

The newly discovered return iPhone iMessages from Jonny contain comments the defendant and Jonny made to each other beginning in 2015 and continuing through August 5, 2016, at 6:00 PM.[2] The iPhone iMessages between the defendant and Jonny contain sexually explicit texts the defendant made to Jonny during their conversation.

Early SMS and iPhone iMessages between the two show the defendant and Jonny confirming plans to meet the following week. See, e.g., Extraction Report[3] at 947 (indicating defendant sent message, "heya still on for next week? fri and

---

[2] The time stamp on the messages show times in Coordinated Universal Time ("UTC"). UTC time is six hours ahead of Mountain Daylight Time, the time standard in Rapid City on August 5, 2016.

[3] Although the defense attached a portion of the full Extraction Report from the defendant's cell phone, the United States has attached the full Extraction Report to the instant Memorandum for the Court's reference. Citations to the Extraction Report will cite to the page number on the full report.

sat eve," followed by Jonny's response, "Sure"). The messages between the two continue on August 2. At one point, after Jonny responds to one of the defendant's messages by texting "Yes sir," the defendant informs Jonny "i am no teacher nor military agent . . . lol xoxo." Id. at 948. Later on August 2, the messages turned sexual, starting with a sexual "punishment" the defendant was going to inflict on Jonny, apparently for referring to the defendant as "sir." The defendant told Jonny the punishment would be "60 of the deepest . . . penetration," with the defendant adding that he "thought it well to trim the little one again . . . . he seems more happy now and dripping of lust for u." Id. at 949-50.

On August 3, the two exchanged messages regarding booking a room for Friday evening. Id. at 949. Later that day, Jonny informed the defendant he would have to work on Friday, then asked when the defendant would arrive in Rapid City. Id. at 950. The defendant replied that he would probably work until 5:00 on Friday, and then had a three-hour drive. Id.

The sexual nature of the conversations increased after that point. The defendant asked Jonny, "what u wanna do to me or have done to u"? Id. at 951. Jonny responded, "Everything." Then, when the defendant asked for details, Jonny replied, "Kiss rim fuck suck. I like when a guy pisses on asshole." Id. The defendant responded, asking to clarify "piss play," followed by "lol" and the comments, "anyone ever pissed inside u? always wondered how it feels to piss inside someone . . .". Id. at 952. The reference to "piss play" referred back to

6

two prior conversations wherein Jonny had used the term in conversations with the defendant—on July 24, 2016, and November 11, 2015. See, e.g., id. at 959, 1013. The conversation about this topic continued on for a few messages, then the defendant asked Jonny, "want me to cum inside u?" Id. The defendant wrote, "lking forward to do bb again, been maby uears [sic] i trusted someone enough," then asked, "want me to 'friendly rape' u? kinda gentle dry bb forced . . .". Id. The defendant added, "i used to feel sorry for my x, don't like to hurt ppl i like, so i always lubed up." Id. Jonny specifically asked the defendant whether he was "clean" and the defendant did not disclose he was HIV positive. Id. The defendant then asked Jonny whether he wanted him to "cum inside" Jonny. Id. The two exchanged nude photographs of each other. Id. at 954-55.

Sexual discussions continued for several messages until Jonny stated he would have to go to bed due to an illness. Id. at 956. The messages between them continued the next day, and the two began to make arrangements to meet on August 5, 2016. Id. at 957. The defendant told Jonny he might arrive earlier than originally planned on August 5, at possibly "5 or 6." Id.

On August 5, at 5:42 PM, the defendant sent an SMS message giving Jonny his room number at a Rapid City hotel. Id. at 957. Then at 5:51 PM, Jonny informed the defendant, "Hey sorry. Just got home. Bad news. I'm not going to be able to make until 10 or 11. Which might be cool cuz u can take a nap." Id. The defendant asked, "so why did i took half day off and rushed over here?" Id. at 958. Jonny apologized again, and the defendant responded, "wish

7

u let me know earlier, could've visited my friends on the way then." Id.  At 6:00 PM, Jonny replied, "I didn't know myself until about 45 minutes ago." Id.  The defendant and Jonny exchanged no further messages after that, but the defendant sent Jonny one more message at 7:34 PM, writing, "if i dont respond here" Jonny should use another phone number.  Id. at 947.

The evidence at trial and in the full Extraction Report showed the defendant began communicating with Investigator Freeouf, who was posing as the 14-year-old male, at 7:08 PM the same evening.  T.T. 70; Exh. 2; Extraction Report at 3495.[4]  That communication continued until the defendant's arrest later that night.

The full Extraction Report also shows that, after Jonny cancelled the meeting, the defendant, using the Grindr identity Genissie and other messaging formats, began sending open-ended messages to numerous other individuals in addition to Freouff's 14-year-old persona.  See Extraction Report at 3494-95; see also T.T. 58 (noting defendant's profile name was "Genissie").  Included in those messages, the defendant asked other individuals questions like, "feel like meeting now?", a message sent at 6:43 PM to "lane rapid city grdr g".  Id. at 3495.  In other messages, the defendant asked several individuals on Grindr, "hi . . . any facepix pls."  Id. at 3495-96.  When Freeouf's 14 year-old persona responded

---

[4] Although the testimony at trial and on Exhibit 2 showed communications between Freeouf's persona and the defendant at 7:19 PM, the fulll Extraction Report actually shows the defendant's first message to Freeouf occurred eleven minutes earlier than previously known, at 7:08 PM.  See Extraction Report at 3495.

with a "Hello" at 7:11 PM, and a photograph, the defendant responded by asking, "how old r u"?  Id. at 3496.  After that point, the defendant continued message exchanges with other individuals, though the messages between him and others reduced as the messages with Freeouf's 14 year-old persona increased in both frequency and sexual-related content, through the time of the defendant's arrest at around 8:33 PM on August 5.  See id. at 3496-3500.

### DISCUSSION

**A.     Motion for New Trial**

Under Fed. R. Crim. P. 33(a), the Court may vacate a judgment and grant a new trial in the interest of justice.  The decision to grant or deny a Rule 33 motion "is within the sound discretion of the [district] court."  United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002). "Motions for new trials based on the weight of the evidence are generally disfavored." Id.  "That being said, the district court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly and with caution.' " Id.; see 3 Charles Alan Wright, Federal Practice and Procedure § 553, at 248 (2d ed. 1982) ("granting new trial under Rule 33 is an unusual remedy that is reserved for 'exceptional cases in which the evidence preponderates heavily against the verdict' ").

When faced with a motion for a new trial, unlike a motion for judgment of acquittal, a district court may weigh the evidence and judge witness credibility for itself to determine if a miscarriage of justice occurred requiring a new trial.

United States v. Davis, 534 F.3d 903, 912 (8th Cir. 2008); see United States v. Worman, 622 F.3d 969, 978 (8th Cir. 2010) (noting a district court may upset a jury's finding only if it ultimately concludes a miscarriage of justice will occur). But "[a] district court should not grant a motion for a new trial simply because it would have reached a different verdict." United States v. Bertling, 510 F.3d 804, 808 (8th Cir. 2007).  "[T]he court may grant a new trial motion where it finds that the verdict is contrary to the weight of the evidence . . . where the evidence presented weighs heavily enough against the verdict that the court believes a miscarriage of justice may have occurred." Id. (quoting United States v. Smart, 501 F.3d 862, 865 (8th Cir. 2007)).

### B.   Brady

"The government must disclose evidence favorable to a defendant whether requested or not." United States v. Jones, 101 F.3d 1263, 1272 (8th Cir. 1996) (citing Kyles v. Whitley, 514 U.S. 419, 433, 115 S. Ct. 1555 (1995)). "The rule of Brady is limited to the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." United States v. Kime, 99 F.3d 870, 882 (8th Cir. 1996) (citation omitted).  "A Brady violation has three components: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " United States v. Anwar, 880 F.3d 958, 969 (8th Cir. 2018) (quoting Strickler v. Greene, 527 U.S. 263, 281–82, 119 S. Ct. 1936 (1999)).  In

order for evidence to be considered material, the defendant must show a "reasonable probability that had it been disclosed, the result of the proceeding would have been different." United States v. Robinson, 809 F.3d 991, 996 (8th Cir. 2016). " 'A reasonable probability' is a probability sufficient to undermine confidence in the outcome." Kime, 99 F.3d at 882 (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985)).

### 1.   Suppression of Evidence

The United States took no action to affirmatively suppress any evidence related to the defendant. Instead, the evidence discovered after the trial was unintentionally overlooked. However, under Eighth Circuit and Supreme Court authority, whether suppression of favorable information was made in good faith or bad faith is irrelevant to the Brady analysis. "[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." United States v. Pendleton, 832 F.3d 934, 940 (8th Cir. 2016) (quoting Brady, 373 U.S. at 87, 83 S. Ct. 1194).[5] Accordingly, while the United States unequivocally informs the Court no information was withheld intentionally or in bad faith, neither by counsel for the United States nor by

---

[5] The United States asserts the evidence was not intentionally suppressed or withheld from the defense. Instead, agents involved in the investigation overlooked a single folder containing the messages to and from the defendant at issue in the instant motion. While the Court need make no finding with regard to whether the oversight was done in good faith in order to rule on the instant motion, the United States is prepared to provide evidence to demonstrate the agents acted in good faith.

members of the South Dakota Internet Crimes Against Children (ICAC) task force, it simultaneously acknowledges the lack of bad faith does not change the analysis of the issue presented here.  The United States did not provide the new evidence outlined above to the defendant until after the trial of this matter.  Thus, the Court must consider the remaining two elements of a Brady.

### 2.    Evidence Favorable to the Defendant

The defendant's claim fails here, because he has not shown the evidence was favorable to him.  See Anwar, 880 F.3d at 969 (concluding evidence was not favorable nor material to defense when evidence did not exculpate defendant, but instead tended to inculpate him, evidence supported charges against defendant, and was cumulative).  Here, as in Anwar, to the extent the new evidence is material to the case, it is highly inculpatory as to the defendant.

The defendant is unable to show he would have taken the stand if the evidence had been provided to him before the trial.  According to the argument in his brief, ostensibly the defendant decided not to testify because the prosecutor would have impeached him about the lack of corroboration in the SMS messages regarding his alleged plans to meet another person "later on the day of his arrest."  See Docket 115 at 2.  To the contrary, the defendant would have been even less likely to have taken the stand with all of the information from the full Extraction Report.  The new information is far more damaging to him and his defense and would have created several more areas of impeachment of the defendant than the evidence available at the time of trial.

First, the new information would have shown the defendant had plans to meet another person later that day, thereby corroborating his claim that he had plans for a sexual encounter later so he could not have had the intent to have sex with the 14 year-old.  As the full Extraction Report shows, however, the defendant's plan to meet Jonny ground to a halt when Jonny said he would not be available until 10:00 or 11:00 PM.  After Jonny informed the defendant of this, and after clearly expressing his displeasure with Jonny, the defendant ceased communicating with Jonny at 6:00 PM on August 5, save a single text message with a different phone number sent at 7:34 PM.  See Extraction Report at 947, 958.  At best, this information only corroborates the defendant's assertion that he at one point had plans to meet another person, not that the plans existed at the time he met the 14 year-old.

The information contained in the full Extraction Report is equally as unpersuasive as the communications, or lack thereof, presented at trial and do not corroborate the defendant's claim at all.  To the contrary, the full Extraction Report also shows the defendant was aroused from the explicit conversations he and Jonny had been sharing, but Jonny cancelled shortly before they were scheduled to meet.  The defendant essentially cut his communications with Jonny and began his search for a different sexual partner, soliciting complete strangers, unlike Jonny, with whom he had been communicating for months. The full Extraction Report shows the defendant did not respond to Jonny's last apology in any attempt to salvage the date.  He did not so much as seek to keep

Jonny on the hook by texting Jonny to say he would still meet Jonny at 10:00 or 11:00 PM.  Instead, he essentially ceased communications and began a search for a new sexual partner.  For all intents, the defendant shut out Jonny and desperately began seeking sex partners via Grindr, which culminated in the predation of Freeouf's young persona.

Further, the defense sought before trial to keep out any reference to the defendant being HIV positive.  Defendant's First Motion in Limine, Docket 60. The United States did not oppose the motion, but instead reserved the right to readdress the issue should the defendant make such evidence relevant.  United States' Response to Defendant's First Motion in Limine, Docket 74 at 1.  The defendant's text message conversations with Jonny were vividly sexually explicit, referring to specific sexual acts that involved exchange of bodily fluids, including urine.  Extraction Report at 951-59.  The defendant wrote, "want me to cum inside u?" Id.  The defendant also wrote, "lking [sic] forward to do bb again, been maby uears [sic] i trusted someone enough," then asked, "want me to 'friendly rape' u? kinda gentle dry bb forced . . .".  Id.  In the United States' experience with online sexual communication "bb" means "bareback" which describes sexual intercourse without a condom.  In addition, when Jonny asked the defendant if he was "clean," clearly referring to venereal disease, the defendant lied by omission and did not disclose he was in fact HIV positive.  The defendant also discussed exchange of "cum" via oral sex with Jonny.  Had the United States been aware of these communications with Jonny and the defendant chose to

14

testify, the United States would have zealously impeached him with the content of these messages because they are in direct contradiction to the image he tried to portray of himself through his defense.  Throughout the trial, starting with opening statements, the defendant portrayed himself as a stand-up member of the gay community, only seeking to help the misguided 14 year-old boy.  The above statements, expressing his interest in unprotected sex with an unsuspecting adult when he was aware he was HIV positive, paints a completely contrary picture of the defendant's character.  The evidence about his status as HIV positive, but still seeking forceful, unprotected sex involving exchange of different bodily fluids would have been highly relevant, and therefore admissible, to rebut the stated defense.  This line of impeachment would be far more devastating to the defendant than the previously anticipated line of impeachment regarding whether he actually had a date with Jonny that night.

The full content of the Extraction Report solidified proof of the defendant's intent to meet the 14 year-old boy and engage in an act of sexual penetration. The content showed a sexually aroused defendant carrying on explicit conversations with Jonny, explaining in detail the sexual acts the defendant wished to perform.  Then Jonny delayed the plans roughly at the same time the defendant was scheduled to arrive in Rapid City and after he checked into a local motel.  Shortly after being rejected, the defendant began sending numerous messages to several other individuals, starting with a "hi" to the individuals, then seeking pictures and locations.  When he did receive pictures, he would comment

15

about the individuals' looks or begin asking sexually oriented questions. See, e.g., Extraction Report at 3494-96. Over the course of the next hour or more, the defendant sent out Grindr messages to multiple other users attempting to find some other individual to meet. During the course of sending out multiple messages, he successfully contacted Investigator Freeouf's 14 year-old persona. The defendant then began his grooming of the 14 year-old boy. That attempt at grooming ultimately resulted in the defendant engaging in the offense for which he was convicted.

The additional messages from the full Extraction Report do nothing to assist the defendant in his defense. Instead, impeachment regarding his desperate search for sex that night would have been far more devastating than even the content that allegedly kept him off the stand at trial. The aroused defendant was rejected at the last minute by the man with whom he had been carrying on explicit sexual conversations for days. The defendant proceeded to scorch the Grindr earth in search of a sexual date for the evening. Far from exculpating the defendant, the new information demonstrated his motivation to find sexual fulfillment from another source aside from Jonny. When the defendant believed he had found a willing participant in the 14 year-old boy, he followed through by arranging a meeting, and going to meet, with the 14 year-old.

Moreover, the full Extraction Report showed the defendant was engaged in multiple other explicit text conversations with other individuals, who variously

used names such as "Tommy" and "Chris," or descriptors such as "Horny," "Looking for . . .," and "18 and bi." Id. at 3494. The report shows the defendant, after Jonny's rejection, went on a hasty campaign to find pictures, quickly engaged in sexually oriented conversations with these others, and attempted to find locations for the others in order to secure a meeting. Once the defendant had piqued the interest of Freeouf's 14 year-old persona, he devoted all his attention to the sexual encounter with him, much as he had devoted his attention to Jonny before their encounter was essentially cancelled.

Assuming the defense was able to admit conversations the defendant had with Jonny in an effort to prove the later meeting was still scheduled to occur, the prosecutor would have been able to cross examine the defendant about the sexual nature of all the messaging he undertook in the hours and even days leading up to his arrest. Far from supporting a defense that the defendant intended to counsel the youth, the graphic sexual nature of the messages with Jonny and others showed just how serious the defendant was about having a sexual encounter with whomever he was able to line up on short notice.

Next, the evidence does not provide an alibi for the defendant. As noted above, the defendant's potential meeting with Jonny was delayed for five to six hours after he arrived in Rapid City. The defendant immediately went to work, attempting to locate another sexual partner. Regardless of whether the defendant had abandoned any thought of meeting Jonny later, he clearly expressed his sexual intent with not only the 14 year-old, but with other

individuals in the meantime.   The additional content from the full Extraction Report would have shown that nothing about any potential meeting with Jonny detracted from his intent to engage in a sexual act with other individuals after Jonny effectively cancelled the date.

Moreover, the new evidence was not directly relevant to the charge against the defendant.   The timing of any potential meeting with Jonny was hours after the time the defendant arranged to meet with the 14 year-old.   And that potential meeting was all but cancelled when the defendant provided no response to Jonny's mention of a meeting at 10:00 or 11:00 PM, except for one message from the defendant providing a different phone number for contact.   Nothing in the record demonstrated the defendant would have been unable to both meet and carry through with his stated intent with the 14 year-old and still meet later with Jonny, assuming the meeting with Jonny was still a possibility.

Finally, and probably most damning to the defense, was the defendant's message exchange with Jonny clarifying that to the defendant, the term "play" actually means penetration and injection of bodily fluids.   Throughout the trial, the defense claimed the defendant's statement to Freeouf's 14 year-old persona that they would engage in "gay play" did not prove he had the intent to engage in an act of sexual penetration.   The content of the full Extraction Report revealed quite the opposite.   In his exchange with Jonny, the defendant wrote, "u gonna have to explain piss play . . . lol," an apparent term used by Jonny in an unknown prior conversation.   Extraction Report at 952.   Immediately thereafter, the

18

defendant asked Jonny, "anyone ever pissed *inside* u?  always wondered how it feels to piss *inside* someone. . ."   Id.   His chosen verbiage stands in sharp contrast to the defense assertions at trial that the term "play" was nothing more than a colloquialism for meeting and touching.  This exchange clearly shows that to the defendant "play" meant penetration.  This would have been widely used by the United States to prove the flaw in the defense argument regarding penetration and "gay play."

The defendant hired Dr. Ilan Meyer, a proffered expert regarding the gay community.  The jury was unpersuaded by his testimony, but would have been even more so after impeachment with the above facts.  Dr. Meyer, during his testimony, would have been impeached with the above information, had the United States been aware of what was in the full Extraction Report.  Any opinion he might have had that the defendant having unprotected sex with an unsuspecting gay man when the defendant was HIV positive somehow comported with the norms of the gay community would have been unbelievable.

The information from the full Extraction Report provided nothing of true value to the defense as compared to what it would have provided to the United States.  Said differently, the United States' case would have greatly benefitted from the content of the full Extraction Report.  Frankly, any claim by the defendant that he was a responsible member of the gay community merely helping an endangered youth would have been gutted by the content of the full Extraction Report, showing him as nothing more an irresponsible predator

willing to endanger the life of another member of the gay community.  As such, the defendant necessarily fails to meet his burden to show the suppressed evidence was favorable to him.

### 3.    Materiality and Probable Different Outcome

The defendant's argument fails on the third part of the <u>Brady</u> test, as well. As the Court noted in its initial Order denying the defendant's motion for acquittal, the evidence was sufficient to support the verdict.  <u>See</u> Docket 105.  In fact, the evidence was strong as it related to the charge for which the defendant was convicted.  The defendant's primary argument before the jury was that the United States failed to prove he took a substantial step toward an act of sexual penetration.  The jury found him guilty of the offense.  The defense raised the issue in motions for judgment of acquittal both during and after the trial.  As noted above, the Court properly denied the motions.

The newly discovered evidence is only tangentially related to any potential defense to the charges in this case.  The elements of the offense required proof the defendant 1) used a cell phone or computer attached to the internet to attempt to knowingly persuade, induce, entice, or coerce a minor to engage in sexual activity; 2) he believed the individual was under 18 years of age; and 3) he could have been charged with a criminal offense under South Dakota law if the sexual activity had occurred.  Docket 89 at 6-7.

Nothing about a potential meeting with Jonny was directly relevant to the elements of the offense with which the defendant was charged.  To the extent it

20

had any relevance to the case, the evidence from the full Extraction Report further demonstrated the defendant's intent with regard to the meeting with the 14 year-old. Far from providing some form of exoneration or excuse for his actions with regard to the 14 year-old, it proved the defendant was highly aroused and desperately seeking a sexual partner. Admission of the new evidence would not have changed the result of the trial. Instead, the new evidence only solidifies confidence in the result the jury reached.

The United States acknowledges the prosecutor mentioned in closing argument the lack of any evidence to corroborate the defendant's claim that he was going to meet another individual that evening. The new evidence of course contradicts that assertion. In the context of the overwhelming evidence of the defendant's guilt adduced at trial, the issue of the defendant having another possible date that evening would not have altered the verdict. This is especially so considering that the full Extraction Report cast serious doubt that Jonny was actually going to show up to engage in sex with the defendant that night. To the contrary, the new evidence appears to show Jonny delayed the date, and the defendant chose to seek another sexual outlet. Further, even if Jonny was not standing up the defendant that night, there was no evidence the defendant was incapable of engaging in acts of sexual penetration with both the 14 year-old and Jonny. Said differently, the evidence made no difference. The defendant has tried to inflate the importance of the Jonny meeting when, in fact, it was meaningless.

21

In sum, no difference in the outcome that would have resulted from the admission of content of the full Extraction Report.  The United States would have zealously argued in favor of admission of the full content of the Extraction Report, and as explained above, the high probative value of the evidence likely would have led to its admission.

In light of the strong case against the defendant, which would only become stronger with the admission of the new evidence, this argument played such an insignificant role that a new trial is not warranted here.

**CONCLUSION**

The defendant has failed to meet his burden under <u>Brady</u>, and thus the United States requests the defendant's motion for new trial (Docket 114) be denied.

Dated this 15th day of October, 2018.

RONALD A. PARSONS, JR.
United States Attorney

*/s/ Eric Kelderman*

Eric Kelderman
Assistant United States Attorney
515 9th Street, Room 201
Rapid City, South Dakota 57701
E-mail: eric.kelderman@usdoj.gov

22