UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br> vs.<br><br>ANDRIES SNYMAN,<br><br>    Defendant. | CR. 16-50102-JLV<br><br>ORDER |

**INTRODUCTION**

On December 8, 2017, following a three-day trial, a jury convicted defendant Andries Snyman of one count of attempted enticement of a minor under 18 U.S.C. § 2422(b). (Dockets 91 & 97). Defendant filed a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, which the court denied. (Docket 105). Defendant later filed a motion for a new trial alleging the government failed to disclose evidence as required under Brady v. Maryland.[1] (Docket 114). The government resists the motion. (Docket 134). The court finds defendant's trial was marred by the government's failure to disclose evidence favorable to defendant and material to the question of his guilt as well as an instruction error. A new trial is necessary to avoid a miscarriage of justice.

---

[1] 373 U.S. 83 (1963).

# DISCUSSION

## I. Facts

### A. Offense conduct

Defendant was working on a ranch in Isabel, South Dakota, in 2016. Docket 123 at p. 40; see also Trial Ex. 3A at pp. 1, 12, 17-18.[2] On August 5, 2016, Investigator Brian Freeouf of the Pennington County Sheriff's Office and member of the Internet Crimes Against Children Taskforce ("ICAC"), logged on to the mobile phone application Grindr to undertake an operation where he posed as an underage boy to locate "adults that wanted to have illegal sex" with children. (Docket 123 at pp. 45-46, 56). The nature of Grindr was contested at trial. Investigator Freeouf testified Grindr is "strictly for homosexual hookups, sex acts, and for other gay homosexual men, not women, to meet each other." Id. at p. 49. Defense expert Dr. Ilan Meyer, as well as government rebuttal expert Dr. Irene Summers Temple, testified LGBT men use Grindr for socialization in addition to sex. Id. at pp. 58-59, 106.

Defendant, also on Grindr, began a conversation with Investigator Freeouf's underage persona while using the screenname "Genissie". (Docket 123 at pp. 58-59). Investigator Freeouf took screenshots of the Grindr conversation, which were admitted as evidence at trial. Id. at p. 57; see also

---

[2]Trial exhibit 3A is a transcript of law enforcement's interrogation of defendant on August 5, 2016. A redacted recording of the interrogation was admitted into evidence and played for the jury at trial. (Docket 123 at pp. 97-101). The transcript was given to the jury as a demonstrative aid while the recording was played, but it was not admitted as evidence. Id. at pp. 100-01.

Trial Ex. 1. Defendant messaged, "hi any facepix pls" and Investigator Freeouf responded with a photograph of an underage boy associated with law enforcement. Docket 123 at pp. 59-60; Trial Ex. 1. Upon receiving the photograph, defendant asked how old the persona was. (Docket 123 at p. 60). Investigator Freeouf responded he was fourteen. Id. Defendant and the persona proceeded to exchange messages on Grindr. Id. at pp. 61-65; Trial Ex. 1. At trial, Investigator Freeouf testified the Grindr messages concerned gay sex. Docket 123 at p. 63.

Investigator Freeouf then moved the conversation off of the Grindr application to text messages. Id. at pp. 65-66. The text messages between Freeouf and defendant were recorded from Freeouf's cell phone. Id. at p. 68. They were admitted into evidence at trial. Id. at p. 68-95 (Investigator Freeouf's trial testimony concerning the text messages); see also Trial Ex. 2. Defendant and Investigator Freeouf began messaging one another on Grindr at 7:08 p.m. and moved to text messages at 7:43 p.m. Trial Ex. 1 & 2. Defendant sent the last text message at 8:33 p.m. Trial Ex. 2. Investigator Freeouf testified he and other law enforcement agents arrested defendant at approximately 8:30 p.m. at a local high school, where he had offered to meet defendant. (Docket 123 at pp. 83, 95-97).

Immediately after his arrest, Investigator Freeouf and Special Agent Brent Gromer of the South Dakota Department of Criminal Investigation ("SA Gromer") interrogated defendant. Id. at pp. 97-98. The interrogation was recorded and played for the jury. Id. at 100-01. During that interrogation, defendant stated

3

he did not intend to have sex with Investigator Freeouf's persona.  Trial Ex. 3A at p. 4.  He stated he wanted to warn the persona about the dangers of meeting older men online and explain LGBT life to him.  Id. at pp. 2-4, 9.  Defendant told Investigator Freeouf and SA Gromer he had had sex with people he met online in the past, but that they were all over the age of 18.  Id. at p. 11.  He stated he had met "[m]aybe three or four" minors, but he never had sex with any of them.  Id.  Defendant also voluntarily gave up the passcode to his iPhone.  Id. at p. 10.  Finally, defendant told Investigator Freeouf and SA Gromer he had plans to meet up with another man that night.  Id.

    **B.    Additional messages**

On December 6, the second day of trial, defense counsel informed the court he received a "stack of paperwork" from the prosecutor at 5 p.m. the evening before.  (Docket 123 at p. 26).  The paperwork was an "Extraction Report" containing a history of defendant's text messages going back to 2013.  Id. at p. 121; Docket 115 at p. 2.  The Extraction Report was not offered or admitted into evidence.  At trial, relying on the Extraction Report, both parties elicited testimony from Investigator Freeouf that defendant sent messages to other individuals on August 5, the day of his arrest.  (Docket 123 at pp. 154-63).  One of those individuals was a person named in the Extraction Report as "rapid city jonny hello grdr" ("Jonny").  (Dockets 115 at p. 2 & 123 at p. 157).  Investigator Freeouf testified defendant sent eight text messages to Jonny between August 3 and his arrest and that all eight messages were unanswered.  (Docket 123 at pp. 161-62).  He also testified defendant called Jonny eight times

4

and each call was of a short enough duration to suggest that no one answered. Id. at pp. 162-63.

When she turned over the Extraction Report, the prosecutor informed defense counsel she did not intend to use the text messages in her case-in-chief, but would use them to impeach defendant's claim "he had plans to meet someone later . . . on the day of his arrest."  (Docket 115 at p. 2).  Defendant did not testify.  However, the prosecutor argued in her closing that defendant lied when he stated under interrogation he was planning to meet up with another man on the evening of his arrest.  (Docket 124 at p. 121).  Defense counsel now asserts defendant did not testify out of fear of being impeached with the text messages purportedly showing Jonny did not respond to any of his inquiries. (Docket 115 at p. 3).

The Extraction Report disclosed at trial was incomplete.  The government now states it inadvertently disclosed only SMS text messages and call logs. (Docket 134 at pp. 4-5).  It asserts "agents involved in the investigation overlooked a single folder" containing other messages and that neither it nor the agents "withheld [information] intentionally or in bad faith[.]"  (Docket 134 at p. 11).  The complete Extraction Report shows defendant and Jonny messaged each other multiple times through Apple iMessage and another "instant message" application (which appears to be Grindr) from 2015 up until the

evening of defendant's arrest.³  Id. at p. 4.  In their conversation leading up to August 5, defendant and Jonny discuss both plans to meet on that day (the "planning messages") and the sexual nature of the proposed meetup (the "sexual messages").  Id. at pp. 5-8.  At 5:51 p.m. on the date of the arrest, Jonny told defendant he would have to postpone their meeting until 10 or 11 p.m.  Id. at p. 7; see also Docket 134-1 at p. 957.⁴  Shortly after 6 p.m., defendant began messaging a number of individuals on Grindr, all with the same message: "hi." (Docket 134-1 at pp. 3494-95).  Investigator Freeouf's persona, operating under the name "Ced Don," was one of these individuals.  Id. at p. 3495.

---

³"Text messages or texts are brief, electronic messages between two or more mobile devices.  There are multiple technologies for sending text messages, but the traditional or standard technology is the Short Message Service and Multimedia Messaging Service ("SMS/MMS") protocols.  As an alternative to this standard protocol, Apple's proprietary text messages are known as "iMessages" and are sent using the "Messages" client application.  Instead of the SMS/MMS protocol for sending and receiving messages, iMessages use Wi–Fi and cellular data networks to send messages and other content between two Apple devices."  Backhaut v. Apple, Inc., 74 F. Supp. 3d 1033, 1038 (N.D. Cal. 2014) (internal quotations and citations omitted).

"Once an iPhone user activates iMessage, the interface for sending iMessages and SMS/MMS text messages on the Messages client application is the same.  The Messages application automatically checks if the contact to whom the text message is being sent is also registered as an iMessage user.  If the contact is registered as an iMessage user, the text message is sent as an iMessage, bypassing the SMS/MMS system of the sender's cellular carrier.  If the contact is not registered as an iMessage user, the text message is sent as an SMS/MMS.  The Messages application does not allow the user to select whether a text message will be sent using iMessage or SMS/MMS."  Id.

⁴The government provided the full Extraction Report to the court as a disc containing 6010 pages of data extracted from defendant's cell phone and organized by the Cellebrite program.  (Docket 134-1).  This version of the Extraction Report was generated on July 2, 2018, over seven months after the guilty verdict, using the raw data extracted from defendant's iPhone 4 following his arrest.  Id. at p. 1.

6

Investigator Freeouf conducted the forensic analysis of defendant's iPhone. (Docket 123 at pp. 102-08). Prior to trial, the government noticed Investigator Freeouf as an expert witness who would testify regarding his "knowledge, skill, training and experience with mobile device forensic analysis" including "[h]is training and experience regarding use of the Cellebrite UFED forensic tool" used to produce the Extraction Report. (Docket 54 at pp. 2-3). According to his resume, Investigator Freeouf is a Cellebrite certified Logical Operator and Physical Analyst. (Docket 54-1 at p. 4). In its expert notice, the government stated it provided defendant with a copy of Investigator Freeouf's "forensic examination report detailing his forensic analysis of the . . . iPhone 4." (Docket 54 at p. 2). The record does not disclose further information about this forensic examination report or its relationship to the Extraction Report at issue.

On February 6, 2018, approximately two months after the conviction, defense counsel requested from the government "all raw forensic extractions and acquisitions (the bit-for-bit copy of the original evidence) of any devices that were seized from" defendant. (Docket 115-1). In response, the government provided the full Extraction Report and the raw data from defendant's iPhone. (Docket 115-2 at p. 2). Defense expert Daniel Meinke ran the raw data through his own Cellebrite program and discovered the messages between defendant and Jonny. Id. at pp. 3-4. Mr. Meinke also filed an affidavit stating the messages between defendant and Jonny were "readily apparent and discoverable through the application of routine forensic analysis techniques." (Docket 139-1 at p. 2). Mr. Meinke disagreed with the government's assertion it overlooked the messages between defendant and Jonny. Id.

7

## II. Legal Standard

### A. Motion for a new trial

Federal Rule of Criminal Procedure 33 permits the court to vacate the jury's verdict and grant a new trial. Fed. R. Crim. P. 33(a). Defendant timely filed the motion within the three years allotted for claims grounded in newly discovered evidence.[5] Fed. R. Crim. P. 33(b)(1). The decision to grant or deny a Rule 33 motion "is within the sound discretion of the [district] court." United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002). The court's discretion is both broad and limited. Id. It is broad to the extent the court "can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." Id. (internal quotation marks and citations omitted). "[T]he court need not view the evidence most favorably to the verdict." United States v. Worman, 622 F.3d 969, 977 (8th Cir. 2010); United States v. Lacey, 219 F.3d 779, 783-84 (8th Cir. 2000) (In determining whether to grant a Rule 33 motion, "the court need not view the evidence in the light most

---

[5]Defendant brings his motion for a new trial under Federal Rule of Criminal Procedure 33(b)(1), which applies to motions based on newly discovered evidence. Docket 114; see also Fed R. Crim. P. 33(b)(1). It is not clear the full Extraction Report constitutes newly discovered evidence, as the data contained in the Report was derived from defendant's iPhone, which has been available throughout this case. However, the government does not assert the motion should have been brought under Rule 33(b)(2)—which has a 14-day time limit—nor does it argue the motion is untimely. To the extent a timeliness issue presents itself because the motion may have been more properly brought under Rule 33(b)(2), the court concludes the deadline should be extended because the government failed to turn over the potentially exculpatory evidence in the Report. The court finds the defense's failure to timely file a Rule 33(b)(2) motion constitutes excusable neglect under these circumstances. See Fed. R. Crim. P. 45(b)(1)(B).

8

favorable to the government, but may instead weigh the evidence and evaluate for itself the credibility of the witnesses."). The court's discretion is limited to the extent the court must allow the jury's verdict to stand unless it determines a miscarriage of justice will occur. Worman, 622 F.3d at 978 ("A district court will upset a jury's finding only if it ultimately determines that a miscarriage of justice will occur.").

"A district court should not grant a motion for a new trial simply because it would have reached a different verdict." United States v. Bertling, 510 F.3d 804, 808 (8th Cir. 2007). When considering a Rule 33 motion for a new trial, "what the district court . . . thinks of a defendant's guilt or innocence is of little import if there is sufficient evidence to support the jury's guilty verdict. The jury watched and heard each witness testify, viewed the documentary evidence, and came to a conclusion about who and what to believe." United States v. Fazio, 487 F.3d 646, 656 (8th Cir. 2007). The district court should use its authority to grant a Rule 33 motion "sparingly and with caution." Campos, 306 F.3d at 579.

### B. Brady

"Under Brady, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." Smith v. Cain, 565 U.S. 73, 75 (2012). "This duty extends not only to evidence of which a prosecutor is aware, but also to material 'favorable evidence known to the others acting on the government's behalf in the case, including the police.' " United States v. Robinson, 809 F.3d 991, 996 (8th Cir. 2016) (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)).

9

"To establish a claim under Brady, [defendant] must establish that (1) the government suppressed evidence; (2) the evidence was favorable to him; and (3) the evidence was material to the outcome of the trial."  United States v. Garrett, 898 F.3d 811, 816 (8th Cir. 2018).

Brady "evidence is material only if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different." Robinson, 809 F.3d at 996 (internal quotation omitted).  "A reasonable probability is a probability sufficient to undermine the reviewing court's confidence in the outcome of the proceeding."  United States v. Tate, 633 F.3d 624, 630 (8th Cir. 2011) (internal quotation omitted).  "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.  This means that the omission must be evaluated in the context of the entire record.  If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial."  United States v. Agurs, 427 U.S. 97, 112-13 (1976).

### III. Analysis

#### A. Suppression

The first element in a Brady analysis is whether the government suppressed the evidence in question.  Garrett, 898 F.3d at 816.  The government expressly concedes the element.  (Docket 134 at pp. 11-12).  The

10

court need not inquire further, but concludes the government suppressed the full Extraction Report by failing to provide it to defendant until after trial.[6]

**B.     Favorability**

The second Brady element is whether the suppressed evidence is favorable to defendant.  Garrett, 898 F.3d at 816.   The government vigorously argues the full Extraction Report would not be favorable to the defense at trial.  (Docket 134 at pp. 12-20).   It asserts the sexual messages between defendant and Jonny show defendant's arousal and therefore his intent to have sex with any available party, including Investigator Freeouf's persona.  Id.   Defendant argues the planning messages are favorable because they corroborate his post-arrest statements to law enforcement and establish a jury question as to whether he had plans to meet Jonny for sex that evening, calling into question whether he had the intent to entice Investigator Freeouf's persona into sex.  (Docket 139 at pp. 3-4).

The court first concludes the government's arguments as to this element are better addressed in the materiality analysis.   Suppressed evidence is

---

[6]The court recognizes the United States Court of Appeals for the Eighth Circuit holds evidence is not suppressed under Brady where the government "fail[s] to disclose evidence to which the defendant had access through other channels."  United States v. Zuazo, 243 F.3d 428, 431 (8th Cir. 2001); see also United States v. Stuart, 150 F.3d 935, 937 (8th Cir. 1998).  Here, the court does not know whether defendant could have obtained the relevant messages by undertaking his own forensic examination of the iPhone.  However, the government expressly concedes the defense did not have access to the messages before trial.  The court sees no reason to disturb this concession.  Cf. Purnell v. Mo. Dep't. of Corrs., 753 F.2d 703, 708 (8th Cir. 1985) (holding, in habeas context, "when . . . the state unequivocally concedes in pleadings [an element of the claim], that concession constitutes an express waiver.'").

11

favorable "either because it is exculpatory, or because it is impeaching[.]" Strickler v. Greene, 527 U.S. 263, 281 (1999). At this stage of the analysis, the court does not weigh the evidence to determine whether it is favorable in comparison with other evidence. The favorability element is established if the evidence, standing alone, exculpates defendant or impeaches government witnesses.

The court concludes the suppressed messages are favorable to defendant as exculpatory evidence. At trial, defendant asserted he did not have the intent to entice Investigator Freeouf's persona into illegal sexual activity. (Docket 124 at p. 134) (defense counsel stating in closing argument, "the intent is key and really it's the only thing that is at issue. . . . We are here because Mr. Snyman didn't intend to have sex with this 14 year old."). The planning messages support that theory. They show defendant planning over a series of days to meet Jonny on the evening of August 5. (Docket 134-1 at pp. 947-58). On August 5, Jonny asked to push back the meeting until 10 or 11 p.m. Id. at pp. 957-58. In response, defendant appeared upset but asked Jonny to text him at a different number. Id. at pp. 947, 957-58. The record does not appear to contain any messages from that alternate number. These messages provide ample support for the theory that defendant intended to meet with Jonny on the evening of August 5. Relying on the planning messages, defendant could argue to a jury he had no intent to entice Investigator Freeouf's persona into sex because he had a planned sexual meeting later that evening with Jonny.

The planning messages are also favorable to defendant as exculpatory evidence because they corroborate his statements to law enforcement, including to Investigator Freeouf's persona. During the text conversation with the persona, defendant stated "i am meeting you w no intentions, i just want to help u by explaining all to u[.] u r lucky i have time lol meeting friends much latet[.] well, around 10[.]"[7] Trial Ex. 2. Later, during the post-arrest interrogation, defendant told law enforcement he was "not interested" in sex with the persona because he was meeting "another guy" he had been talking to "since last year[.]" Trial Ex. 3A at p. 10. Defendant stated he doesn't "do this six, seven times a night" because of his age. Id. The planning messages support defendant's post-arrest statements. Being able to argue to the jury that he has consistently asserted his planned meeting with Jonny precluded an intent to entice the persona into sex is certainly favorable to defendant. The planning messages enable that argument.

The court finds the suppressed planning messages are favorable to defendant.

**C.     Materiality**

The final <u>Brady</u> factor is whether the suppressed evidence is material to the outcome of the trial. <u>Garrett</u>, 898 F.3d at 816. Suppressed evidence "is material only if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different." <u>Robinson</u>, 809 F.3d at 996

---

[7]The messages are transcribed verbatim as they appeared in the exhibit given to the jury.

13

(internal quotation omitted). "In other words, favorable evidence is subject to constitutionally mandated disclosure when it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Cone v. Bell, 556 U.S. 449, 470 (2009).

As noted above, the government asserts the full conversation between defendant and Jonny—not just the messages establishing their plans to meet on August 5—is not material to the outcome of the trial because it shows defendant intended to have sex with any available person that night. (Docket 134 at pp. 12-20). The government also argues the sexual messages between defendant and Jonny—in which they discuss sexual acts involving the exchange of bodily fluids—make defendant's HIV status relevant and admissible at trial. Id. at pp. 14-15. Finally, the government contends the defendant's use of the term "piss play" in a sexual context belies the defense argument at trial that the term "gay play" was not necessarily sexual. Id. at pp. 18-19. The entirety of the conversation, the government argues, "only solidifies confidence in the result the jury reached." Id. at p. 21.

In response, defendant asserts only the planning messages are relevant in the Brady analysis. (Docket 139 at pp. 8-9). In the alternative, he argues the sexual messages are inadmissible or do not outweigh the importance of the planning messages so as to render them immaterial. Id. at pp. 9-11. Defendant also contends the government's allegedly intentional or "grossly negligent" suppression of the messages should weigh in favor of their materiality.

14

Id. at pp. 7-8.  Finally, defendant asserts he would have testified had the planning messages been disclosed before trial.[8]  Id. at p. 6.

At the outset, the court must note the Brady analysis "is not a sufficiency of evidence test" nor does it demand a defendant show he "would more likely than not have received a different verdict with the evidence[.]"  Kyles v. Whitley, 514 U.S. 419, 434 (1995).  The court need only determine whether there is a "reasonable probability that . . . the result of the proceeding would have been different" if the messages had been disclosed.  Robinson, 809 F.3d at 996 (internal quotation omitted).  That standard is met here.

The planning messages lend support to the defense case.[9]  They support defendant's factual contention he planned to meet Jonny on August 5 for sex.  If the defense can establish that fact at a second trial, it is more likely the jury could take the inferential step to a conclusion defendant lacked the intent to entice the persona into sex because he had a sexual liaison planned for that evening.  The defense in this case centered on the intent element and the planning messages are highly relevant to that element.  The court finds the messages would have been material to the outcome of the trial because there is a "reasonable probability that, had [they] been disclosed, the result of the [trial]

---

[8]The court cannot determine whether the possibility of being impeached with an incomplete Extraction Report lacking the planning messages actually persuaded defendant not to testify.  Because the court finds defendant is entitled to a new trial on other grounds, it need not attempt to ascertain why he did not testify.

[9]The government did not argue the planning messages would be inadmissible at trial.

15

would have been different." Robinson, 809 F.3d at 996 (internal quotation omitted). The court's "confidence in the outcome" of the trial is "undermine[d]" by the failure to disclose the planning messages. Tate, 633 F.3d at 630 (internal quotation omitted).

In contrast, the government's trial evidence was not as "overwhelming" as it claims. (Docket 134 at p. 21). In fact, virtually every message defendant sent to Investigator Freeouf's persona is capable of being interpreted to support the defense theory that defendant did not intend to persuade the persona into sex, but instead wanted to explain to him the dangers of sexual activity. For example, defendant exchanged the following messages with the persona:

| | |
|---|---|
| Defendant: | i am curious ro talk to u, just hope u r careful who u meet on here, some weird guys around |

. . .

| | |
|---|---|
| Freeouf: | . . . I am kinda nervous never done this before U? |
| Defendant: | totally understand thats why i rather want to meet u than some weirdo, want to talk i through it, make sure u r comfortable and sure, and n gentle w u[.] no way u can't now? i van get u where u r and take u back[.] we can go to a public place if u feel safer |

. . .

| | |
|---|---|
| Freeouf: | What do you think I would be into for first time? |
| Defendant: | ? just talk then see[.] what do you mean with into |
| Freeouf: | I scared gotta know what to expect[.] I have no idea never done anything like this |
| Defendant: | just talk and explain all then u decide promise u i will stop if u dont want to |

| | |
|---|---|
| Freeouf: | I don't know |
| Defendant: | always a first time better if w someone who cares |
| Freeouf: | hehe |
| Defendant: | i am in the car yes or no[.] i just want to make sure u know what its about because i never had the priviledge of anyone explaining to me properly, had to learn the hard way |

Trial Ex. 2.

These messages are certainly capable of supporting the defense theory. Defendant never directly stated he wanted to have sex with the persona or asked the persona to have sex with him. In many of the messages, defendant evinces concern for the persona and expresses a desire to inform him about sexual matters. While the court is not "discounting the inculpatory evidence in light of the undisclosed evidence," it cannot escape notice that the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," given the susceptibility of these messages—the government's primary evidence—to an interpretation favorable to defendant. Kyles, 514 U.S. at 434-35.

The government's reliance on the sexual messages between defendant and Jonny as a method of challenging the exculpatory effect of the planning messages is misplaced. As defendant points out, the sexual messages may well be inadmissible. They raise obvious problems under Federal Rules of Evidence 401 and 403 regarding their relevance and potential to unfairly prejudice defendant or confuse the jury. It is highly doubtful the sexual messages with

17

Jonny have any bearing at all on defendant's intent in his conversation with the persona.  Given their content, it is likely any probative value of the sexual messages is outweighed by the danger of unfair prejudice.  The court previously excluded any mention of defendant's HIV status.  (Dockets 60 & 80 at p. 2).  The court will make any necessary evidentiary rulings for a second trial at a pretrial conference or during trial.  However, the court cannot conclude the sexual messages are so damning as to justify denying the motion for a new trial when those messages face serious obstacles to admissibility at a second trial.

Even assuming they are admissible, the sexual messages with Jonny are not overwhelming evidence of defendant's guilt.  They do not state defendant intended to have sex with the persona, or with any child.  Instead, they relate to consensual sexual activity between adults entirely separate from defendant's conversation with the persona.  If the court determines the sexual messages are admissible at a second trial, the jury can give them whatever weight they find appropriate.  The sexual messages do not detract from the court's finding that the planning messages would have been material to the outcome of the trial.

Defendant established the three elements of a Brady violation as to the suppressed planning messages.  "Because the net effect of the evidence withheld by the [government] in this case raises a reasonable probability that its disclosure would have produced a different result, [defendant] is entitled to a new trial."  Kyles, 514 U.S. at 421-22.

18

### D. Instruction error

Aside from the Brady issue, one other matter weighs in favor of granting a new trial. The court improperly instructed the jury concerning the intent element of attempted enticement of a minor. The court instructed the jury "it is necessary for the government to prove that Mr. Snyman intended to engage in sexual activity with the [persona][.]" (Docket 89 at pp. 6-7). This instruction misstates the intent required for a conviction.

> In order to convict a defendant of . . . 18 U.S.C. § 2422(b) . . . the government must prove . . . that the defendant knowingly used the facility of interstate commerce with the intent to persuade or entice a person to engage in illegal sexual activity[.] *The government need not prove that the defendant intended to participate in a physical sexual act.* It is sufficient for the government to prove that the defendant intended to persuade or entice a minor to engage in illegal sexual activity.

United States v. Pierson, 544 F.3d 933, 939 (8th Cir. 2008) (emphasis added).

> While it may be rare for there to be a separation between the intent to persuade and the follow-up intent to perform the act after persuasion, they are two clearly separate and different intents and the Congress has made a clear choice to criminalize persuasion and the attempt to persuade, not the performance of the sexual acts themselves. Hence, a conviction under the statute only requires a finding that the defendant had an intent to persuade or to attempt to persuade.

United States v. Bailey, 228 F.3d 637, 639 (6th Cir. 2000). The court's intent instruction was not legally accurate. While no party raised this issue, the court concludes it further supports the need for a new trial, especially since intent was the contested element at trial. The court's instruction error, coupled with the Brady violation, lead the court to conclude "a miscarriage of justice will occur" in the absence of a new trial. Worman, 622 F.3d at 978.

## VI. Conclusion

The government's failure to disclose the messages between defendant and Jonny—whatever the reason for that failure—created "a reasonable doubt" about defendant's guilt "that did not otherwise exist[.]"  Agurs, 427 U.S. at 112.  "In [the] absence" of these messages, the court cannot say defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Kyles, 514 U.S. at 434.  Accordingly, "constitutional error has been committed" and a new trial is necessary.  Agurs, 427 U.S. at 112.  The instruction error on the intent element bolsters the court's conclusion.

## ORDER

For the above reasons, it is

ORDERED that defendant's motion for a new trial (Docket 114) is granted.

IT IS FURTHER ORDERED that the jury verdict (Docket 97) is vacated.

IT IS FURTHER ORDERED that a scheduling order shall issue.  New case deadlines shall be set pursuant to the Speedy Trial Act.  See 18 U.S.C. § 3161(e).

IT IS FURTHER ORDERED that United States Magistrate Judge Daneta Wollmann shall determine if defendant should remain in custody pending retrial under the Bail Reform Act.

Dated July 24, 2019.

> BY THE COURT:
>
> /s/ *Jeffrey L. Viken*
> JEFFREY L. VIKEN
> CHIEF JUDGE